# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-3802

_____

In re:  Charter Communications, Inc.,    *
Subpoena Enforcement Matter    *
   *
_____    *
   *
The Recording Industry Association    *
of America,    *
   *
         Appellee,    *
   *
United States of America,    *
   *
Intervenor on Appeal,    *
   *   Appeal from the United States
       v.    *   District Court for the
   *   Eastern District of Missouri.
Charter Communications, Inc.,    *
   *
         Appellant.    *
   *
_____    *
   *
Consumer and Privacy Groups;    *
SBC Internet Services; Verizon    *
Internet Services, Incorporated;    *
Bellsouth Telecommunications;    *
United States Internet Service    *
Providers Association; United    *
States Internet Industry Association;    *
Progressive Internet Action;    *
Frontier Communications of America,    *

Incorporated; Southern Star;           *
                                             *

Amici on behalf of Appellant.      *
                                             *

Motion Picture Association       *
of America, Incorporated;         *
Association of American Publishers;  *
Association for Independent Music;   *
American Federation of Musicians   *
of the United States and Canada;     *
AFMA; American Federation of      *
Television and Radio Artists;       *
American Society of Media         *
Photographers; the Authors Guild,   *
Incorporated; Broadcast Music,     *
Incorporated; Business Software    *
Alliance; The Church Music       *
Publishers Association; Directors    *
Guild of America, Incorporated;    *
Entertainment Software Association;  *
GraphicArtists Guild, Incorporated;  *
Office of the Commissioner of Baseball; *
Professional Photographers of America; *
Recording Artists Coalition;       *
Screen Actors Guild, Incorporated;  *
SESAC, Inc.; Songwriters Guild of   *
America; Software & Information     *
Industry Association; Writers Guild   *
of America, West, Incorporated,     *
                                             *

Amici on Behalf of Appellee.      *
                                             *

_____

Submitted: June 14, 2004
Filed: January 4, 2005 **(Corrected 1/18/05)**

_____

Before MURPHY, BYE, and BRIGHT, Circuit Judges.

_____

BYE, Circuit Judge.

This case concerns whether the Digital Millennium Copyright Act (DMCA), specifically 17 U.S.C. § 512(h), permits copyright owners and their representatives to obtain and serve subpoenas on internet service providers (ISPs) to obtain personal information about an ISP's subscribers who are alleged to be transmitting copyrighted works via the internet using so-called "peer to peer" or "P2P" file sharing computer programs. The dispute arose when the Recording Industry Association of America (RIAA) requested the clerk of the district court to issue subpoenas under § 512(h) to Charter Communications, Inc. (Charter),[1] in its capacity as an ISP, requiring Charter to turn over the identities of persons believed to be engaging in unlawful copyright infringement. The district court issued the subpoenas and denied Charter's motion to quash. We reverse.

I

Starting in the 1980s, internet users began "posting" copyrighted works on electronic bulletin boards (BBSs). A BBS allows a user to post files for others to download to their computers. Other internet users would then copy and download the posted works from the BBS. Beginning in the early 1990s, copyright owners began suing individuals who unlawfully disseminated copyrighted music, photographs, and software. Such litigation targeted BBSs operated from home computers. Advances in technology, however, including the use of MP3 format (a

---

[1]Charter is a cable company that serves markets throughout the United States. In addition to offering traditional cable television service, it offers broadband internet access.

compressed digital format) facilitated the piracy, and by 1998 approximately three million sound recordings were believed to be downloaded from the internet daily.

In 1999, such activity reached new heights with the emergence of so-called peer-to-peer (P2P) systems. Like BBS sites, P2P systems allow users to disseminate files stored on their computers to other internet users. Napster was the first and most notorious P2P system, and the courts ultimately shut it down via an injunction. See A & M Records, Inc. v. Napster, Inc., 284 F.3d 1091, 1099 (9th Cir. 2002); A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1027 (9th Cir. 2001). Other P2P systems have emerged since then, including KaZaA, Grokster, Morpheus, and iMesh. It is this new generation of P2P systems being implicated in the present case.

Unlike earlier centralized P2P file-sharing programs which rely upon a single facility for identifying files, the new generation of P2P file sharing programs allow an internet user to access the files located on other computers through the internet. By utilizing the new technology, an internet user can search directly the MP3 file libraries of other users, with no web site being involved because the transferred files are not stored on the computers of the ISP providing the peer-to-peer users with internet access. See Recording Ind. Ass'n of Am. v. Verizon Internet Servs., Inc., 351 F.3d 1229, 1232 (D.C. Cir. 2003), *petition for cert. filed*, 2004 WL 1175134 (U.S. May 24, 2004) (No. 03-1579). Significant to this case is that Charter's role in disseminating the allegedly copyright protected material is confined to acting as a conduit in the transfer of files through its network.

Approximately 90% of the content on P2P systems is copyrighted movies, software, images, and music disseminated without authorization. It is estimated more than 2.6 billion allegedly infringing music files are downloaded monthly. This Circuit has never determined whether music downloaded from P2P systems violates the copyright owner's rights or is a fair use. The RIAA, to our knowledge, has never prevailed in any infringement actions brought against individual downloaders.

The DMCA has been the principal legislative response to such activities; it was enacted, however, in 1998, prior to the emergence of P2P systems. The DMCA is designed to advance "two important priorities: promoting the continued growth and development of electronic commerce[] and protecting intellectual property rights." H. Rep. No. 105-551(II) at 23 (1998). Title II of the DMCA was the product of lengthy negotiations between copyright owners and internet service providers. It was designed to strike a balance between the interests of ISPs in avoiding liability for infringing use of their services and the interest of copyright owners in protecting their intellectual property and minimizing online piracy. See discussion below. The scope of the DMCA is a primary issue in this appeal.

The RIAA is a trade association representing record companies which create, manufacture and distribute most of the sound recordings produced and sold in the United States. In June 2003, the RIAA announced a nationwide effort to identify and sue individuals committing copyright infringement using P2P systems. In this case, by using tracking programs, the RIAA ascertained the internet protocol (IP) addresses and user names (e.g., paulina400@KaZaA) of ninety-three Charter subscribers suspected of trading copyrighted music files. The RIAA logged onto P2P networks and observed certain users offering the copyrighted songs for downloading. It confirmed the infringement by downloading files offered by individuals and verifying such as being unauthorized copies of copyrighted sound recordings. The RIAA alleges such subscribers collectively made more than 100,000 copyrighted songs available for illegal copying and downloading. Significantly, with an IP address, the RIAA can identify the ISP providing internet access to an alleged infringing party. Only the ISP, however, in this case Charter Communications, Inc. (Charter), can link a particular IP address with an individual's name and physical address.

In this case, purportedly pursuant to § 512(h) of the DMCA, the RIAA obtained subpoenas from the clerk of the district court requiring Charter to produce the names,

physical addresses, telephone numbers, and email addresses of approximately 200 of Charter's subscribers. On October 3, 2003, Charter filed a motion to quash the subpoenas on several grounds. During a November 17, 2003, hearing, the district court denied Charter's motion to quash, and ordered Charter to disclose by November 21 the names, addresses, and email addresses of 150 subscribers who had received notice of the subpoeanas, and to produce the same information by December 1 for another fifty to seventy subscribers who had not yet received notice. See In Re: Charter Communications, No. 4:03MC273CEJ at 1 (Nov. 17, 2003) (Minute Order directing Charter to comply with the terms of the subpoenas with the exception of providing the telephone numbers of the subscribers).

On November 20, 2003, Charter filed a notice of appeal and a motion to stay the district court's order. The district court declined to act on the motion to stay its order before the compliance deadline. Consequently, on the deadline, November 21, 2003, Charter filed with this court an emergency motion to stay order of enforcement of the subpoenas pending appeal, which was denied then.[2] As a result, Charter turned over the subpoenaed names and addresses of its subscribers to the RIAA. This appeal followed.[3]

---

[2]We note that until the filing of this opinion, there have been no obstacles to prevent the RIAA from making use of the information obtained pursuant to the subpoenas at issue in this case.

[3]This case has wide-reaching ramifications, because as a practical matter, copyright owners cannot deter unlawful peer-to-peer file transfers unless they can learn the identities of persons engaged in that activity. However, organizations such as the RIAA can also employ alternative avenues to seek this information, such as "John Doe" lawsuits. In such lawsuits, many of which are now pending in district courts across the country, organizations such as the RIAA can file a John Doe suit, along with a motion for third-party discovery of the identity of the otherwise anonymous "John Doe" defendant.

On appeal, Charter contends the district court erred in enforcing the subpoenas because (1) Section 512(h) applies only to ISPs engaged in storing copyrighted material and not to ISPs, such as Charter, engaged solely as a conduit for the transmission of information by others; (2) a judicial subpoena is a court order that must be supported by a case or controversy at the time of its issuance and no case or controversy existed here; (3) the enforcement of a § 512(h) subpoena violates the privacy protections for cable subscribers in the Communications Act of 1934 set forth in 47 U.S.C. § 551(c)(1); and (4) Section 512(h) violates the First Amendment rights of internet users.

## II

This court reviews de novo the district court's rulings on questions of statutory interpretation. Haug v. Bank of Am., N.A., 317 F.3d 832, 835 (8th Cir. 2003).

We begin our analysis with the language of the statute itself. United States Sec. & Exch. Comm'n v. Zahareas, 272 F.3d 1102, 1106 (8th Cir. 2001). Section 512(h) permits a copyright owner to "request the clerk of any United States district court to issue a subpoena to [an ISP] for identification of an alleged infringer." Significantly, one of the items to be included in any subpoena request is "a copy of a notification described in subsection [512](c)(3)(A)." 17 U.S.C. § 512(h)(2)(A). This notification is a mandatory part of the subpoena request and a condition precedent to the issuance of a subpoena because the statute further provides, as the "[b]asis for granting subpoena," that "the notification filed satisf[y] the provisions of subsection (c)(3)(A)." 17 U.S.C. § 512(h)(4). Thus, Charter argues § 512(h) only authorizes copyright owners to obtain and serve a subpoena on an ISP if the ISP is notified in accordance with the provisions of § 512(c)(3)(A). We turn, then, to the notification provision.

The notification provision of § 512(c)(3)(A) is found within one of the four safe harbors created by the statute to protect ISPs from liability for copyright infringement under certain conditions. Each safe harbor applies to a particular ISP function.[4] The first safe harbor, under § 512(a), limits the liability of ISPs when they do nothing more than transmit, route, or provide connections for copyrighted material – that is, when the ISP is a mere conduit for the transmission. The second safe harbor, under § 512(b), protects ISPs for "system caching," that is, instances when they provide intermediate and temporary storage of material on a system or network under certain conditions. The third safe harbor, under § 512(c), limits the liability of an ISP for infringing material "residing on [the ISP's] system or network at the direction of its users." The fourth safe harbor, under § 512(d), protects an ISP when it merely links users to online locations containing infringing material.

As stated above, the notification provision is found within § 512(c), or the storage-at-the-direction-of-users safe harbor.[5] The notification provision is also

---

[4]A fifth safe harbor, under § 512(e), applies when the ISP is a nonprofit educational institution.

[5]17 U.S.C. § 512(c)(3)(A), the notification provision, (to which 17 U.S.C § 512(h)(2)(A) cross-references) provides:

Elements of notification.--

(A)   To be effective under this subsection, a notification of claimed infringement must be a written communication . . . that includes substantially the following:

(i)   A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii)   Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single

-8-

referenced, however, in two other safe harbors – subsections (b) and (d) – the "system caching" and "linking" safe harbors. Each of these three subsections protect an ISP from liability if the ISP "responds expeditiously to remove, or disable access to, the material that is claimed to be infringing *upon notification of claimed infringement* as described in [§ 512](c)(3)." 17 U.S.C. §§ 512(b)(2)(E), 512(c)(1)(C), and 512(d)(3) (emphasis added). In other words, a specific purpose of the notification provision is to allow an ISP, after notification, the opportunity to remove or disable access to

online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and *that is to be removed or access to which is to be disabled*, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

17 U.S.C. § 512(c)(3)(A) (emphasis added).

infringing material and thereby protect itself from liability for copyright infringement. Therefore, as one might expect, each safe harbor which covers an ISP function allowing the ISP to remove or disable access to infringing material (i.e., the storage, caching, and linking functions) refers to the notification provision *and* contains a remove-or-disable-access provision.

As Charter notes, the safe harbor provision implicated here is § 512(a), which limits the liability of an ISP when it merely acts as a conduit for infringing material without storing, caching, or providing links to copyrighted material. Section 512(a) does not reference the notification provision of § 512(c)(3)(A), nor does it contain the remove-or-disable-access provision found in the three safe harbors created for the storage, caching, and linking functions of an ISP. The absence of the remove-or-disable-access provision (and the concomitant notification provision) makes sense where an ISP merely acts as a conduit for infringing material – rather than directly storing, caching, or linking to infringing material – because the ISP has no ability to remove the infringing material from its system or disable access to the infringing material.

Based on this analysis of the statute, Charter argues § 512(h) does not allow a copyright owner to request a subpoena for an ISP which merely acts as a conduit for data transferred between two internet users. Charter avers the text and structure of the DMCA require the ISP to be able both to locate and remove the allegedly infringing material before a subpoena can be issued against it. Thus, where Charter acted solely as a conduit for the transmission of material by others (its subscribers using P2P file-sharing software to exchange files stored on their personal computers), Charter contends the subpoena was not properly issued. We agree.

The United States Court of Appeals for the District of Columbia Circuit recently considered this identical issue in holding § 512(h) only permits a copyright owner to obtain and serve a subpoena on an ISP for identifying information about an

alleged infringer if the ISP is provided statutory notification under 17 U.S.C. § 512(c)(3)(A), which in turn, requires the ISP to be able to both locate and remove the allegedly infringing material. Verizon, 351 F.3d at 1233-36.

The court held where an ISP performs only the "conduit" functions addressed in § 512(a), § 512(h) does not authorize the subpoenas because the ISP "can not remove or disable [a requirement of § 512(c)(3)(A)(iii)] one user's access to infringing material resident on another user's computer." Id. at 1235. The court further concluded the concept of removing or disabling access to particular material could not be equated with the distinct remedy of termination of a subscriber's account. Id. As to the RIAA's failure to comply with the requirement of identifying material to be removed or disabled, the court also rejected the RIAA's argument it had "substantially" met the notification requirements of § 512(c)(3)(A), despite its failure to identify material to be removed or disabled. Id. at 1236. Additionally, the court emphatically rejected the RIAA's reliance on a broad definition of "service provider" in § 512(k)(1)(B), concluding however broadly that internet service provider may be defined in that section, a subpoena may issue to an ISP only under the prescribed conditions regarding notification set forth in § 512(c)(3)(A). Id.

The court also analyzed the structure of § 512 as a whole, and in particular the fact that § 512(h) cross references § 512(c)(3), and subsection (c) pertains to the safe harbor for "Information residing on systems or networks at direction of users." The court concluded "the references to § 512(c)(3)" in subsections (b) through (d) "lead inexorably to the conclusion that § 512(h) is structurally linked to the storage functions of an ISP and not to its transmission functions, such as those listed in § 512(a)." Id. at 1237.

The court further concluded it is the province of Congress, not the courts, to decide whether to rewrite the DMCA "in order to make it fit a new and unforeseen internet architecture" and "accommodate fully the varied permutations of competing

-11-

interests that are inevitably implicated by such new technology." Id. at 1238 (internal quotations and citations omitted).

We agree with and adopt the reasoning of the United States Court of Appeals for the District of Columbia Circuit in Verizon as it pertains to this statutory issue. Thus, because the parties do not dispute that Charter's function was limited to acting as a conduit for the allegedly copyright protected material, we agree § 512(h) does not authorize the subpoenas issued here. As a court we are bound to interpret the terms of the statute and not to contort the statute so as to cover the situation presented by this case.

For purposes of this appeal, we do not address the constitutional arguments presented by Charter, but do note this court has some concern with the subpoena mechanism of § 512(h). We comment without deciding that this provision *may* unconstitutionally invade the power of the judiciary by creating a statutory framework pursuant to which Congress, via statute, compels a clerk of a court to issue a subpoena, thereby invoking the court's power. Further, we believe Charter has at least a colorable argument that a judicial subpoena is a court order that must be supported by a case or controversy at the time of its issuance. We emphasize, however, for purposes of this appeal we do not reach these issues and have decided this case on the more narrow statutory grounds.

Accordingly, it is hereby ordered the November 17, 2003, order of the United States District Court for the Eastern District of Missouri enforcing various subpoenas for personal information about Charter's subscribers is hereby vacated. This matter is hereby remanded so the district court may: (1) Order the RIAA to return to Charter any and all information obtained from the subpoenas; (2) Order the RIAA to maintain no record of information derived from the subpoenas; (3) Order the RIAA to make no further use of the subscriber data obtained via the subpoenas; and (d) Grant such

-12-

other relief not inconsistent with this order the district court deems appropriate in these circumstances.

MURPHY, Circuit Judge, dissenting.

Because the court focuses too narrowly in its reading of the DMCA, overlooks certain plain language used by Congress, and fails to give effect to the statute as a whole, I respectfully dissent. The subpoena power created by Congress in § 512(h) does not limit the type of service provider for whom subpoenas may be issued in the fight against internet piracy. Section 512(h) authorizes a copyright owner or its representative to request a subpoena to a service provider in order to identify infringers, and the statutory definition of "service provider" in § 512(k) specifically includes conduit service providers such as Charter. Moreover, no other section of the statute imposes the limitation on the subpoena power urged by Charter.

In enacting the DMCA Congress sought to protect both the interests of copyright holders and of internet service providers concerned about their own liability for infringement by their customers. The legislative solution in response to these concerns significantly limited the liability of ISPs for infringement by their customers and provided copyright holders more direct means to attack digital piracy. The subpoena provision in § 512(h) is one of these means, and this provision is of special value to a copyright owner seeking to stop infringement through conduit service providers. That is because a conduit ISP does not store materials for downloading and is thus cannot directly remove or disable access to any infringing material. By using the § 512(h) subpoena power to learn the identity of conduit service subscribers who infringe, copyright holders are able to take steps to protect their interests, seek compensation for their misappropriated property, and stop infringement.

To interpret the statute in the way Charter urges, and the court adopts, is to block copyright holders from obtaining effective protection against infringement

through conduit service providers. The repercussions of infringement via the internet are too easily ignored or minimized. Regarded by some as an innocuous form of entertainment, internet piracy of copyrighted sound recordings results in substantial economic and artistic costs. See Jeff Leeds, Music Industry Turns to Napster Creator for Help, N.Y. Times, December 3, 2004, at C1 (internet file trading networks permit fans to obtain "virtually any song at any time...gratis" while "ravaging CD sales and weakening the underpinnings of the industry"). It is not just faceless corporations who pay the cost. Local music retailers are also vulnerable to the allure of free music, see David Segal, Requiem for the Record Store; Downloaders and Discounters Are Driving Out Music Retailers, Wash. Post, Feb. 7, 2004 at A1 (sales of record retailers "hammered by Internet piracy" and now in "serious trouble"), and artists can lose economic incentive to create and distribute works.

Copyright laws were foreseen by the framers of the Constitution as "the engine of free expression." Harper & Row Publishers, Inc., v. Nat'l Enters., 471 U.S. 539, 558 (1985); see U.S. Const. art. I, § 8, cl. 8 (giving Congress the power to "promote the Progress of...useful Arts, by securing for limited Times to Authors...the exclusive Right to their respective Writings"). Piracy substantially undermines this incentive. Annual losses to copyright owners even before the expansive growth in peer to peer file sharing were estimated to be $11 to $20 billion. H. Rep. No. 105-339, at 4 (1997). Since copyright holders are effectively unable to recover from the designers of file trading software, see Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd., 380 F.3d 1154 (9th Cir. 2004), cert. granted, 2004 WL 2289054 (2004), or from internet service providers, see 17 U.S.C. §§ 512(a)-(d), action against identified infringers offers the only practical means to protect the interests of copyright holders.

The subpoena requested by the RIAA in this case was authorized by and in compliance with the DMCA, and the district court's order enforcing it should be affirmed.

I.

The increasing use of peer to peer file sharing programs makes the DMCA subpoena power very significant. Such programs were already being developed at the time of the congressional hearings preceding the passage of the DMCA. See Electronic Piracy and the No Electronic Theft (NET) Act: Hearing Before the Subcomm. on Courts and Intellectual Property of the Comm. on the Judiciary, 105th Cong. 17-18 (1997) (statement of Deputy Assistant Attorney General Kevin DiGregory about the direct transfer of copyrighted material through electronic bulletin boards, file transfer protocol sites, and email). Peer to peer programs allow individual internet users to access infringing materials located on the personal computers of others and to download them onto their own equipment. These programs are used to transmit infringing materials through conduit services. Congress recognized the need to address infringement through conduit service providers in the DMCA, and its opening section applies to networks which transmit infringing materials at the direction of their users. § 512(a).

While copyright owners are now able to use special software to identify the internet protocol (IP) addresses and the service providers used by traders in copyrighted files, it is the ISPs who have the names and personal addresses of the infringers. The only viable way for copyright owners to vindicate their intellectual property rights in a timely manner when infringing materials are transmitted across peer to peer networks is to subpoena the ISPs for disclosure of the identities of alleged infringers.

The effectiveness of the § 512(h) mechanism may be seen in this case. Appellant RIAA, which represents the owners of copyrights to an extensive collection of sound recordings, used a tracking program to discover that ninety three of Charter Communication's internet subscribers were offering more than 100,000 copyrighted recordings of its members for downloading. RIAA downloaded the files and

confirmed that the offerings were illegal copies of copyrighted materials. It then requested a subpoena from the clerk of the Eastern District of Missouri to obtain from Charter the names, physical and email addresses, and telephone numbers of the infringing subscribers. The clerk issued the subpoena. After it was served on Charter, it filed a motion in the district court to quash it. The district court held a hearing before ruling, then issued an order denying Charter's motion to quash. Although the court enforced the subpoena, it denied RIAA's request for subscriber telephone numbers. Charter's motion for an emergency stay was denied by this court, and Charter then provided RIAA with the subpoenaed information.

The statutory right to request a subpoena is not limited by the type of ISP. Any copyright owner or authorized agent "may request the clerk of any United States district court to issue a subpoena *to a service provider* for identification of an alleged infringer." § 512(h)(1) (emphasis added). A request is to be made by filing with the clerk the following: a copy of a notification containing information outlined in § 512(c)(3)(A), a proposed subpoena, and a sworn declaration that the applicant's purpose is solely to identify the alleged infringer to protect its statutory rights. § 512(h)(2). If the notification and declaration are in proper form, the clerk shall issue the subpoena "expeditiously." § 512(h)(4). This permits a copyright owner to proceed directly against an infringer without delay and thereby avoid further losses.

Although Charter contends that the subpoena power in the DMCA is limited by the function of the ISP, such a limitation is not to be found in a plain reading of the DMCA. To the contrary, the statute defines "service providers" in § 512(k) as all "provider[s] of online services or network access," including conduit providers who offer the "transmission...of material of the user's choosing, without modification." § 512(k)(1). If Congress had wanted to limit the type of ISP subject to a statutory subpoena, it could have easily specified that in § 512(h), but it did not. In the absence of such a limitation, the statute's definition of "service provider" in § 512(k)(1) controls, and it includes Charter. See United States v. Missouri Pac. Ry. Co., 213 F.

169, 173 (8th Cir. 1914) ("[W]here the legislative body makes no exception to a general and clear declaration..., the conclusive presumption is that it intended to make none, and it is not the province of the courts to do so.").

Following the approach of the D.C. Circuit in <u>Verizon</u>, the majority relies on the § 512(h) reference to the notice provision in § 512(c)(3)(A) to read a limitation into the availability of subpoenas.  One of the documents to be included in a subpoena request is "a copy of a notification described in subsection (c)(3)(A)." § 512(h)(2)(A).  The notification subsection is entitled "Elements of notification" and it lists six: (i) the signature of someone authorized to act on behalf of the owner of the infringed copyright; (ii) identification of the copyrighted work claimed to be infringed; (iii) identification of the infringing material; (iv) information reasonably sufficient to allow  the ISP to contact the complaining party; (v) a statement of the complaining party's good faith belief that the material is being used in an unauthorized manner; and (vi) a statement that the notification is accurate and the complaining party is authorized to act on behalf of the owner.  <u>See</u> § 512(c)(3)(A).

The majority focuses on just one of these six elements to arrive at its position that § 512(h) subpoenas were not intended by Congress to be directed at conduit service providers.  Its focus is on the third notice element which requires identification of the infringing material.  That subsection reads as follows:

> Identification of the material that is claimed to be infringing *or* to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and the information reasonably sufficient to permit the service provider to locate the material.

§ 512(c)(3)(A)(iii) (emphasis added). The majority claims that this language excludes conduit ISPs, but the language does not say that. The subsection defines the material to be identified in two ways: (1) material that is "claimed to be infringing" and (2) material that is "the subject of infringing activity and that is to be removed or access

-17-

to which is to be disabled." Id. In the statute, the two definitions are joined by the word "or," a word commonly used to distinguish between alternatives. See United States v. Wilson, 41 F.3d 399, 401 (8th Cir. 1994) ("Terms connected by 'or' ...normally are read to have separate meanings and significance."); United States v. Smeathers, 884 F.2d 363, 364 (8th Cir. 1989) ("Normally, the word 'or' connotes disjunction."). The majority's reading of the subsection ignores the use of the disjunctive form in describing the infringing material (the subsection also contains a second use of the disjunctive form to distinguish "to be removed or...to be disabled"). Were we to disregard the disjunctive form in this case, we would fail in our "obligation...to give effect to congressional purpose so long as the congressional language does not itself bar that result." Johnson v. United States, 529 U.S. 694, 710 n.10 (2000).

The distinction within § 512(c)(3)(A) between material "claimed to be infringing" and material that is "the subject of infringing activity and that is to be removed or access to which is to be disabled" appears to carry forward the initial distinction in the DMCA between § 512(a) conduit ISPs and §§ 512(b)-(d) storage ISPs. The copyrighted material stored on an ISP's network becomes the subject of infringing activity when it is unlawfully duplicated by subscribers. In order to remove such material or disable access to it, a storage ISP needs it to be identified. On the other hand, when a subscriber transfers copyrighted material through a conduit ISP, that service provider cannot remove the material from the network. It can, however, provide identifying information about the offeror of the material "claimed to be infringing." Indeed, as the government points out, the subsection's two categories of material are not mutually exclusive, and a conduit ISP can indirectly disable access to material by terminating the accounts of an infringing subscriber.

Section 512(h), which creates the subpoena power, only references § 512(c)(3)(A) to indicate the kind of information which needs to be given to the clerk to request a subpoena. By referencing the elements of the notification in

-18-

§ 512(c)(3)(A), Congress avoided the necessity of repeating such notice details in § 512(h). The statutory requirement that storage service providers expeditiously remove or disable access to infringing materials in order to avoid secondary liability is not rooted in this notification provision, but rather in those sections of the DMCA which set out the obligations of storage providers. See §§ 512(b)(2)(E), 512(c)(1)(C), 512(d)(3).

Charter's restrictive view of the subpoena power rests entirely on its reading extra words into § 512(c)(3)(A)(iii) to limit its applicability to storage ISPs. It reads the provision as if the subsection referred to material that is (1) "claimed to be infringing" and that is to be removed or access to which is to be disabled, or material that is (2) "the subject of infringing activity and that is to be removed or access to which is to be disabled." That is not what Congress said, however. To the extent that the § 512(h) cross reference to § 512(c)(3)(A)(iii) is fairly seen to be subject to different interpretations, it is ambiguous, and any ambiguity must be resolved by looking to the intent of Congress in its enactment of the legislation. See Premachandra v. Mitts, 727 F.2d 717, 727 (8th Cir. 1984).

The intent of Congress in enacting the DMCA was to address "massive piracy" of copyrighted works over digital networks without hampering technological development of the internet by the threat of third party liability for service providers. Sen. Rep. 105-190, at 8 (1998). ISPs were only shielded from monetary and injunctive liability in exchange for their assistance in identifying subscribers who engage in acts of piracy over their networks and in removing or disabling access of infringers to protected works when technically possible. Congress wanted to create "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment," while at the same time providing "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." Id. at 40.

The majority's interpretation of the statute undermines this structure. It denies copyright holders the ability to obtain identification of those subscribers who purloin protected materials through § 512(a) conduit ISPs. This interpretation also shields conduit ISPs from liability without requiring their assistance in protecting copyrights. The suggestion that copyright holders should be left to file John Doe lawsuits to protect themselves from infringement by subscribers of conduit ISPs like Charter, instead of availing themselves of the mechanism Congress provided in the DMCA, is impractical and contrary to legislative intent. John Doe actions are costly and time consuming. Nowhere in the DMCA did Congress indicate that copyright holders should be relegated to such cumbersome and expensive measures against conduit ISPs. The legislative history shows that the purpose of the subpoena power in the DMCA was to obtain the assistance of ISPs in an expeditious process to stop infringement. See Sen. Rep. 105-190, at 51 (1998) ("The issuing of the [subpoena] should be a ministerial function performed quickly for this provision to have its intended effect.").

Had Congress wanted to limit the reach of the subpoena power to ISPs engaged in storage functions, it could have easily stated that. It did not, however. Instead, it provided that § 512(h) subpoenas could be requested for a "service provider," and it defined "service provider" in § 512(k) to include conduit ISPs like Charter. A coherent reading of the text and structure of the statute reinforces the message of these sections, which is that the subpoena power created by § 512(h) was intended for use against all types of service providers. See Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 450 (2002) (statutory scheme should be read as "coherent and consistent"); U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 455 (1993) ("Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.") (internal citations omitted).

Since the subpoena to Charter complied with the DMCA and was authorized under it, the district court did not err by enforcing it, and its order should be affirmed.

## II.

Based on its interpretation of the DMCA, the majority vacates the order of the district court without addressing the other arguments Charter raises against enforcement of RIAA's subpoena. It claims that the subpoena provision in the DMCA violates the case or controversy requirement of Article III and that such subpoenas may not constitutionally be issued by a federal court clerk. It also argues that the subpoena would violate the Communication Act, as well as First Amendment rights of its subscribers, and that the district court erred by ordering disclosure of email addresses. RIAA responds to all these arguments, while the intervening United States concentrates on refuting Charter's constitutional attacks.

## A.

Under Article III of the Constitution, the judicial power is limited to the resolution of "cases" and "controversies." U.S. Const. art. III, § 2. Whether a court is presented with a case or controversy is a question of substance, not form. To obtain constitutional jurisdiction there must be "an adversary proceeding, involving a real, not a hypothetical, controversy." Nashville, Chattanooga & St. Louis Ry. v. Wallace, 288 U.S. 249, 264 (1933).

Charter argues that since Article III courts only have jurisdiction if there is a case or controversy, a federal court clerk cannot constitutionally issue a § 512(h) subpoena in the absence of a case. RIAA responds that issuance of a § 512(h) subpoena is a ministerial act by the clerk which has been authorized by Congress and which does not invoke the judicial power. No case or controversy is therefore required it says. Intervenor United States points out that a § 512(h) subpoena would

not be requested in the absence of a controversy between a copyright owner and an infringer so there is no Article III violation; RIAA makes a similar argument. We review the existence of subject matter jurisdiction de novo. Simes v. Huckabee, 354 F.3d 823, 827 (8th Cir. 2004).

Charter alleges that the issuance of a § 512(h) subpoena requires a judicial act, and the majority suggests in dictum that § 512(h) "*may* unconstitutionally invade the power of the judiciary" by compelling a court clerk to issue a subpoena, "thereby invoking the court's power." Charter and the majority do not, however, explain why the clerk's act of issuing a DMCA subpoena is judicial in nature. The terms of § 512(h) do not leave any discretion to the clerk nor do they require any action by the court. The clerk is required to issue a subpoena to an ISP when the desired information is included in a request. Such a request initiates a ministerial act by the clerk. See Mississippi v. Johnson, 71 U.S. 475, 498 (1866) ("A ministerial duty...is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law."). Here it was Charter which decided to invoke the judicial power, by filing a motion to quash. No judge was involved in issuance of the subpoena.

In the compromise Congress legislated between the interests of copyright owners and ISPs, it created a ministerial process through which information can be obtained without the necessity of a civil action. See S. Rep. No. 105-190, at 51 (1998) ("The issuing of the order should be a ministerial function performed quickly for this provision to have its intended effect."). Ministerial acts have long been recognized as nonjudicial by the Supreme Court. See, e.g., Custiss v. Georgetown & Alexandria Turnpike Co., 10 U.S. 233, 236 (1810) (statutory duty of court clerk to record jury inquisitions a "ministerial act" that "requires no exercise of judicial functions").

Over the years Congress has enacted a number of other laws that similarly authorize district court clerks to issue subpoenas in the absence of judicial action or pending litigation. Congress has authorized clerks to issue subpoenas requiring witness testimony in such circumstances as election disputes, 2 U.S.C. § 388, patent and trademark contests, 35 U.S.C. § 24, railroad employment arbitrations, 45 U.S.C. § 157(h), and plant variety protection proceedings, 7 U.S.C. § 2354(a). There is no record that any of these statutory subpoenas have been held to violate the case or controversy requirement of Article III, and no good reason has been shown to hold that the clerk's issuance of a subpoena under § 512(h) is barred by the Constitution.

Federal courts engage in a number of functions in both civil and criminal contexts that do not directly involve adversarial proceedings. See Morrison v. Olson, 487 U.S. 654, 681 n.20 (1988) ("[F]ederal courts and judges have long performed a variety of functions that...do not necessarily or directly involve adversarial proceedings within a trial or appellate court."). In the criminal context, federal courts issue warrants, see Fed. R. Crim. P. 41, review applications for wire taps, see 18 U.S.C. §§ 2516, 2518, and assist grand juries in their investigative functions, Morrison, 487 U.S. at 681 n.20. In the civil context, federal judges are authorized to order depositions even in the absence of a filed case in order to "prevent a failure or delay of justice." Fed. R. Civ. P. 27(a)(3). District courts also oversee requests for discovery from foreign or international tribunals, regardless of whether there is a pending case in a United States court. See 28 U.S.C. § 1782; In re Letters Rogatory from the First Court of the First Instance in Civil Matters, 42 F.3d 308, 310 (5th Cir. 1995).

These precedents indicate that Congress may constitutionally create a subpoena mechanism like that in the DMCA and that the subpoena power of § 512(h) does not violate the case or controversy requirement of Article III.

B.

Charter contends that the disclosures obtained under § 512(h) subpoenas violate the Communications (Cable) Act, 47 U.S.C. § 551. Under the Cable Act, cable operators are prohibited from disclosing personal information that could identify subscribers without obtaining their prior written or electronic consent, and operators are required to take actions to prevent unauthorized access to such information. Id. § 551(c). Charter maintains that these privacy provisions conflict with the disclosure authorized by the DMCA because a § 512(h) subpoena does not require advance notice to an alleged infringer. It argues that a cable operator cannot comply with a DMCA subpoena without violating the Cable Act.

This argument overlooks what Congress did to protect operators from such a dilemma. The DMCA explicitly states in § 512(h) that a subpoenaed service provider must "expeditiously disclose...the information required by the subpoena, *notwithstanding any other provision of law*." § 512(h)(5) (emphasis added). The "notwithstanding" provision in § 512(h) indicates that the DMCA subpoena power is intended to "supersede[] other statutes that might interfere with or hinder the attainment of [its] objective." See Campbell v. Minneapolis Pub. Hous. Auth. ex rel City of Minneapolis, 168 F.3d 1069, 1075 (8th Cir. 1999); see also Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993) ( "As we have noted previously in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override the conflicting provisions of any other section.").

Section 551(c) of the Cable Act is thus superseded by the subpoena provision in the DMCA, and a cable operator can comply with a § 512(a) subpoena without violating the earlier statute.

C.

Charter recognizes that the First Amendment does not protect copyright infringement, Harper & Row Publishers, Inc., v. Nat'l Enters., 471 U.S. 539, 560 (1985), but it argues that § 512(h) violates protected rights of subscribers by compromising their anonymity interests without procedural safeguards to ensure that they have in fact engaged in illegal file sharing. RIAA responds that there is no First Amendment interest at stake in this case and that § 512(h) provides significant procedural protections. The United States agrees and asserts that § 512(h) does not impose any restraint on speech, let alone a substantial burden on protected speech. We review the constitutionality of a statute de novo. United States v. Koons, 300 F.3d 985, 990 (8th Cir. 2002).

Charter contends that "internet speakers" have a "presumptively protected anonymity" and that § 512(h) permits the disclosure of subscriber identity based only on suspicion of infringing conduct. In support of this argument it cites Blount v. Rizzi, 400 U.S. 410 (1971).[6] In Blount, the Supreme Court overturned a federal statute authorizing the Postmaster General to refuse delivery of materials administratively determined to be obscene. 400 U.S. at 421-22. Since the statute permitted suppression of expressive material without a judicial determination of obscenity, it lacked the "sensitive tools" required to separate protected speech from that which may be regulated. Id. at 417. Here in contrast, there is no suppression of material based on its expressive content and the First Amendment is not implicated.

[6]Blount does not mention any presumption of protected anonymity, but the Supreme Court has elsewhere recognized a right to communicate messages anonymously. See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 342 (1995) (pamphleteer's "decision to remain anonymous...is an aspect of the freedom of speech protected by the First Amendment"). Even if Charter were determined to have standing to assert First Amendment rights of its subscribers, it has not shown that the DMCA suppresses the content of any messages.

Moreover, the DMCA has considerable procedural safeguards in its requirements for a subpoena request. These include identification of the work claimed to have been infringed and of the infringing material, statement of a "good faith belief" that unlawful use has occurred, verification of the accuracy of the statements, and a sworn declaration that the information disclosed is sought for and will be used only to enforce ownership rights. See §§ 512(h)(2)(C), 512 (c)(3)(A).

Charter has not shown that the DMCA restrains or censors speech or that it violates the First Amendment.

D.

In its final argument, Charter contends that the district court erred in ordering the disclosure of the email addresses of its subscribers because § 512(h) only requires disclosure of "information sufficient to identify" subscribers and their mailing addresses sufficiently meet that requirement. § 512(h)(3). RIAA counters that § 512(h) entitles it to disclosure of email addresses and that the statute's purpose would be undermined without access to this quick and economical way to contact alleged infringers. We review questions of statutory interpretation de novo. Haug v. Bank of Am., N.A., 317 F.3d 832, 835 (8th Cir. 2003).

Section 512(h)(3) states that the subpoena shall authorize the ISP receiving it to disclose to the copyright owner or his agent "information sufficient to identify" the alleged infringer. While the subsection does not define what information is "sufficient" for identification, the disclosure provision is best read in the light of the statute's "expeditious" requirement. See id.; § 512(h)(5). Since electronic mail provides the fastest and surest means of contacting individuals alleged to have engaged in digital piracy over the internet, email addresses are a most appropriate form of identification. Nothing in § 512(h) precludes the disclosure of email addresses, and the statute in fact includes electronic mail addresses as part of that

-26-

"[i]nformation reasonably sufficient to permit the service provider to contact the complaining party." § 512(c)(3)(A)(iv). Finally, as noted by the district court, email is a less intrusive form of notification than the telephone. The district court did not err by requiring the disclosure of email addresses by Charter.

## III.

Because the subpoena to Charter was properly issued and was authorized under the terms of the DMCA, and there being no constitutional or statutory impediments to its enforcement, the order of the district court should be affirmed.

_____