SRINIVASAN, Circuit Judge,
joined by TATEL, Circuit Judge, concurring in the denial of rehearing en banc:
In this case, a panel of our court upheld the FCC’s 2015 Open Internet Order, commonly known as the net neutrality rule. The parties who unsuccessfully challenged the Order before the panel have now filed petitions seeking review by the full court sitting en banc. The court today denies en banc review. En banc review would be particularly unwarranted at this point in light of the uncertainty surrounding the fate of the FCC’s Order. The agency will soon consider adopting a Notice of Proposed Rulemaking that would replace the existing rule with a markedly different one. See In re Restoring Internet Freedom, FCC (Apr. 27, 2017), https://apps.fcc. gov/edocs_public/attachmatch/DOC-344614 Al.pdf. In that light, the en banc court could find itself examining, and pronoune-ing on, the validity of a rule that the agency had already slated for replacement.
While we concur in the court’s denial of en banc review, we write to respond to a particular contention pressed by one of our dissenting colleagues: that the FCC’s Order, and thus our panel decision sustaining it, departs from controlling Supreme Court precedent in two distinct ways. First, our colleague submits that Supreme Court decisions require clear congressional authorization for rules like the net neutrality rule, and the requisite clear statutory authority, he argues, is absent here. See infra at 418-26 (Kavanaugh, J., dissenting); accord infra at 402-05 (Brown, J., dissenting). Second, our colleague contends that the rule conflicts with Supreme Court decisions ostensibly arming internet service providers (ISPs) with a First Amendment shield against net neutrality obligations. See infra at 426-35 (Kavanaugh, J., dissenting).
Respectfully, both lines of argument are misconceived. As to the first, the Supreme Court, far from precluding the FCC’s Order due to any supposed failure of congressional authorization, has pointedly recognized the agency’s authority under the governing statute to do precisely what the Order does. As to the second, no Supreme Court decision supports the counterintui-tive notion that the First Amendment entitles an ISP to engage in the kind of conduct barred by the net neutrality rule— i.e., to hold itself out to potential customers as offering them an unfiltered pathway to any web content of their own choosing, but then, once they have subscribed, to turn around and limit their access to certain web content based on the ISP’s own commercial preferences.
*383 Before taking up the merits of those two issues, we first emphasize the role in which we examine them. The wisdom of the net neutrality rule was, and remains, a hotly debated matter. The FCC received the views of some four million commenters before adopting the rule, In re Protecting and Promoting the Open Internet, 30 FCC Red. 5601, 5604 ¶ 6 (2015) (Order), and the debate over the rule continues to this day, with the agency now poised to consider replacing it. We have no involvement in that ongoing debate. Our task is not to assess the advisability of the rule as a matter of policy. It is instead to assess the permissibility of the rule as a matter of law. Does the rule lie within the agency’s statutory authority? And is it consistent with the First Amendment? The answer to both questions, in our view, is yes.
I.
According to our dissenting colleague, the FCC’s Order runs afoul of a doctrine he gleans from certain Supreme Court decisions invalidating an agency rule as lying outside the agency’s congressionally delegated authority. Our colleague understands those decisions to give rise to a “major rules” doctrine. That doctrine is said to embody the following understanding about the scope of agencies’ delegated authority: while agencies are generally assumed to possess authority under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to issue rules resolving statutory ambiguities, an agency can issue a major rule — i.e., one of great economic and political significance — only if it has clear congressional authorization to do so. See injra at 418-19 (Kavanaugh, J., dissenting). Our other dissenting colleague generally agrees with this line of argument (although she calls the doctrine the “major questions” doctrine rather than the “major rules” doctrine). See infra at 402-03 (Brown, J., dissenting).
We have no need in this case to resolve the existence or precise contours of the major rules (or major questions) doctrine described by our colleagues. Assuming the existence of the doctrine as they have expounded it, and assuming further that the rule in this case qualifies as a major one so as to bring the doctrine into play, the question posed by the doctrine is whether the FCC has clear congressional authorization to issue the rule. The answer is yes. Indeed, we know Congress vested the agency with authority to impose obligations like the ones instituted by the Order because the Supreme Court has specifically told us so.
The pertinent decision is National Cable & Telecommunications Ass’n v. Brand X Internet Services, 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). That case, like this one, addressed the proper regulatory classification under "the Communications Act of broadband internet service. Brand X involved the provision of broadband internet access via cable systems. At the time of the decision, cable broadband was one of two types of broadband service available to customers, the other being DSL (digital subscriber line). See id. at 975, 125 S.Ct. 2688.
The FCC had applied a different form of regulatory treatment to cable broadband service than to DSL service. The agency had classified DSL as a “telecommunications service” for purposes of the Communications Act. See id. at 975, 1000, 125 S.Ct. 2688. That classification carries significant statutory consequénces. The Act requires treating telecommunications providers as common carriers presumptively subject to the substantial regulatory obligations attending that status. See id. at 975-76, 125 S.Ct. 2688. Common carriers, for instance, generally must afford neutral, *384 nondiscriminatory access to-their services, and must avoid unjust and unreasonable practices in that connection. See id. at 975-76, 1000, 125 S.Ct. 2688.
Whereas the FCC had classified DSL broadband as a telecommunications service, the agency had instead elected to classify cable broadband as an “information service,” the- other of the two classifications available to the agency under the statute. See id. at 978, 125 S.Ct. 2688. Providers of an information service, in contrast with telecommunications providers, are not considered to be common carriers under the Act. As a result, providers of an information service are subject to less extensive regulatory obligations and oversight than are telecommunications providers. See id. at 975-76, 125 S.Ct. 2688.
The issue in Brand X was whether the Communications Act compelled the FCC to classify cable broadband ISPs as telecommunications providers subject to regulatory treatment as common carriers. The Court answered that question no. Critically for our purposes, though, the Court made clear in its decision — over and over — that the Act left the matter to the agency’s discretion. In other words, the FCC could elect to treat broadband ISPs as common carriers (as it had done with DSL providers), but the agency did not have to do so.
The Court, to that end, explained that it had “no difficulty concluding that Chevron applie[d]” to the agency’s decision to classify cable broadband as an information service rather than a telecommunications service. Id. at 982, 125 S.Ct. 2688. The statute’s “silence” on the matter left the Commission “discretion to fill the consequent statutory gap.” Id. at 997, 125 S.Ct. 2688. That meant the question “would be resolved, first and foremost, by the agency.” Id. at 982, 125 S.Ct. 2688 (internal quotation marks omitted); see id. at 980-81, 125 S.Ct. 2688. The Court repeatedly emphasized the Commission’s authority to use “its expert policy judgment to resolve these difficult questions.” Id. at 1003, 125 S.Ct. 2688. In that light, the proper classification of broadband service would turn “on the factual particulars of how Internet technology works and how it is provided, questions Chevron leaves to the Commission to resolve in the first instance.” Id. at 991, 125 S.Ct. 2688.
Consequently, the Court held, the court of appeals in Brand X had “erred in refusing to apply Chevron to the Commission’s interpretation of the definition of ‘telecommunications service,’ ” and in declining to defer to the agency’s decision to treat cable broadband as an information service. Id. at 984, 125 S.Ct. 2688 (quoting 47 U.S.C. § 153(46) (2000) (currently codified at 47 U.S.C. § 153(53))). But deference equally would have been owed, the Supreme Court made clear, if the FCC had reached the opposite resolution by classifying cable broadband providers as telecommunications carriers. That is because the agency had only two regulatory classifications available to it. To affirm the FCC’s statutory discretion to select between them was necessarily to countenance the agency’s treatment of cable broadband as a telecommunications service.
Indeed, the Court went as far as to affirmatively “leave[ ] untouched” the court of appeals’s belief that the better reading of the statute — albeit not the one that had been adopted by the agency— called for treating broadband providers as telecommunications carriers. Id. at 985-86, 125 S.Ct. 2688. And the Court fully understood the significant regulatory implications if the agency were instead to make that choice: classification as a telecommunications service “would require applying presumptively mandatory Title II [i.e., *385 common carrier] regulation to all ISPs.” Id. at 995 n.2, 125 S.Ct. 2688.
The concurring and dissenting opinions in Brand X reinforced the majority’s recognition of the agency’s statutory authority to subject ISPs to regulation as common carriers. Justice Breyer’s concurring opinion concluded that the FCC’s decision to classify cable broadband as an information service fell “within the scope of its statutorily delegated authority — though perhaps just barely.” Id. at 1003, 125 S.Ct. 2688 (Breyer, J., concurring). If the FCC’s election not to impose common carrier obligations on cable broadband ISPs “just barely” fell within the agency’s discretion, the opposite choice necessarily would have fallen comfortably within the agency’s con-gressionally delegated authority.
Justice Scalia’s dissenting opinion, joined by Justices Souter and Ginsburg, went even further. According to Justice Scalia, the statute permitted only one conclusion: cable broadband ISPs “are subject to Title II regulation as common carriers, like their chief competitors [e.g., DSL] who provide Internet access through other technologies.” Id. at 1006, 125 S.Ct. 2688 (Scalia, J., dissenting). The agency, in Justice Scalia’s view, had no discretion to conclude otherwise. And he expressly accepted that his reading of the Act would result in “common-carrier regulation of all ISPs,” a result he considered “not a worry.” Id. at 1011, 125 S.Ct. 2688. (He noted, though, that the agency possessed statutory authority to forbear from applying the full range of common carrier regulatory obligations, id. at 1011-12, 125 S.Ct. 2688, an authority the FCC exercised when it fashioned the rule we now review, see Order ¶¶ 434-532.)
The upshot of Brand X with regard to the FCC’s eongressionally delegated authority over broadband ISPs is unmistakable and straightforward. All nine Justices recognized the agency’s statutory authority to institute “common-carrier regulation of all ISPs,” with some Justices even concluding that the Act left the agency with no other choice. 545 U.S. at 1011, 125 S.Ct. 2688 (Scalia, J., dissenting). In the Order under review, the agency took up the Brand X Court’s' invitation. It decided to classify broadband ISPs as telecommunications providers, enabling it to impose common carrier obligations on ISPs such as the net neutrality rule in question here.
In light of Brand X, our dissenting colleague’s reliance on the “major rules” doctrine cannot carry the day. Recall that the doctrine ultimately embodies an understanding about congressional authorization: an agency, the' doctrine says, can adopt a major rule only if it clearly possesses congressional authorization to do so. The major question at issue here, according to our colleague, is whether the FCC can subject broadband ISPs to common carrier obligations. See infra at 422-23 (Kavanaugh, J., dissenting). If we assume that the FCC’s decision to treat broadband ISPs as common carriers amounts to a major rule, the question then is whether the agency clearly has authority under the Act to make that choice. In Brand X, the Supreme Court definitively — and authoritatively, for our purposes as an inferior court — answered that question yes.
It bears emphasis in this regard that, by the time of Brand X, two of the Supreme Court decisions cited by the dissent as exemplars of the major rules doctrine— MCI Telecommunications Corp. v. Am. Telephone & Telegraph Co., 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994), and FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)—had already been decided. Brown & Williamson is particularly notable. There, the Supreme Court consid *386 ered the FDA’s exercise of its general rulemaking authority under the Food, Drug, and Cosmetic Act to regulate the use of tobacco products by children and adolescents. The Court, although applying principles of Chevron deference to the FDA’s assertion of authority over tobacco products, concluded that Congress did not “delegate a decision of such economic and political significance to an agency in so cryptic a fashion.” Id. at 160, 120 S.Ct. 1291.
Later, in Brand X, the Court reached a different conclusion about the FCC’s regulatory authority over ISPs. The Court, again applying Chevron, this time concluded that Congress had authorized the agency to decide whether to regulate ISPs as common carriers. As between the two possible classifications, “the Commission’s choice of one of them is entitled to deference.” Brand X, 545 U.S. at 989, 125 S.Ct. 2688.
We note, further, that there is no material difference between the technology considered in Brand X and the technology at issue here. The petitioning parties have contended throughout this case that Brand X involved only something referred to as the “last mile” of internet service. But the panel straightforwardly (and unanimously) rejected their effort to make anything of that supposed distinction. See U.S. Telecom Ass’n v. FCC, 825 F.3d 674, 702 (D.C. Cir. 2016); id. at 745 (Williams, J., concurring in part and dissenting in part). Our dissenting colleague likewise makes no effort to distinguish Brand X on such a basis. Rather, both cases involve “the FCC’s authority to classify Internet service as a telecommunications service.” Infra, at 425 (Kavanaugh, J., dissenting); but see infra 404-05 (Brown, J., dissenting). And Brand X, in clearly recognizing the agency’s authority to do so under the Act, negates any argument under the major rules doctrine that the FCC lacked statutory authority to issue the Order we now review.
Our dissenting colleague nonetheless contends that Brand X poses no obstacle to invalidating the FCC’s Order under the major rules doetoine. His argument runs as follows. The question under the major rules doctrine, he observes, is whether Congress has “clearly authorized the FCC to subject Internet service providers to the range of burdensome common-carrier regulations associated with telecommunications services.” Infra at 425 (Kavanaugh, J., dissenting). But the Brand X Court, he then notes, found the statute “ambiguous about whether Internet service was an information service or a telecommunications service.” Id. at 425. In his view, “Brand Xs finding of ambiguity by definition means that Congress has not clearly authorized the FCC to issue the net neutrality rule.” Id. at 426.
That analysis rests on a false equivalence: it incorrectly equates two distinct species of ambiguity. It is one thing to ask whether “Internet service is clearly a telecommunications service under the statute.” Id. at 425. It is quite another thing to ask whether Congress has “clearly authorized the FCC to classify Internet service as a telecommunications service,” which is the relevant question under our colleague’s understanding of the major rules doctrine. Id. The former question asks whether the statute itself clearly classifies ISPs as telecommunications providers. The latter asks whether the statute clearly authorizes the agency to classify ISPs as telecommunications providers.
Our colleague assumes that, if the answer to the former question is no, “that is the end of the game for the net neutrality rule.”' Id. at 425. Not at all. A negative answer to -the former question hardly dictates a negative answer to the latter, more *387 salient, one. The statute itself might be ambiguous about whether ISPs are to be treated as common carriers, but still be clear in authorizing the agency to resolve the question.
Indeed, that dichotomy perfectly captures Brand Z’s holding. Justice Scalia, in dissent, believed that the statute clearly compelled treating ISPs as telecommunications providers. The majority disagreed, finding the statute ambiguous on the question. But the majority found that the agency was empowered to resolve the ambiguity — i.e., to decide whether ISPs should be classified as telecommunications providers presumptively subject to common carrier obligations. In short, whereas Brand X found statutory ambiguity on whether ISPs are telecommunications providers, the decision found no statutory ambiguity on whether the FCC gets to answer that question.
So understood, Brand X dictates rejecting our dissenting colleague’s argument based on the major rules doctrine. It is thus perhaps unsurprising that none of the petitioning parties, no member of the original panel (including our colleague who dissented in part at the panel stage), and neither of the dissenting Commissioners objected to the FCC’s Order as infringing any such doctrine. (We note, though, that a group of intervenors led by TechFreedom makes such an argument.) The major rules doctrine is said to promote separation-of-powers principles by assuring that Congress has delegated authority to an Executive agency to decide a major matter of policy. See infra at 418-19 (Kavanaugh, J., dissenting). But in light of Brand Zs recognition of the FCC’s congressionally delegated authority to decide whether to regulate ISPs as common carriers, it would disserve — not promote — the separation of powers to deny the agency the authority conferred on it by Congress.
In the end, the major rules doctrine, as articulated by our colleague, affords no basis for invalidating the net neutrality rule. The Supreme Court decisions ostensibly giving rise to that doctrine lie far afield from this case. They involve, per our colleague’s description, “regulating cigarettes, banning physician-assisted suicide, eliminating telecommunications rate-filing requirements, or regulating greenhouse gas emitters.” Id. at 421. The Court’s decision in Brand X, by contrast, involved the same statute (the Communications Act), the same agency (the FCC), the same factual context (the provision of broadband internet access), and the same issue (whether broadband ISPs are telecommunications providers, and hence common carriers, under the Act). Brand X unambiguously recognizes the agency’s statutorily delegated authority to decide that issue.
Does Brand X, then, necessarily validate the agency’s decision to classify broadband ISPs as telecommunications providers and to subject them to common carrier obligations? No, it does not. While Brand X recognizes the FCC’s statutory authority to treat broadband ISPs as common carriers, the agency must carry out its authority in a reasonable and non-arbitrary way. The partial dissent from the panel’s disposition believed that the FCC’s Order fell short on those grounds, and the petitioning parties have raised a host of challenges to the agency’s decisionmaking process and outcome. The panel majority concluded otherwise and upheld the rule.
But while Brand X could not have settled the validity of a rule the FCC had yet to promulgate, it did settle the agency’s authority to classify broadband ISPs as telecommunications providers under the Communications Act. The major rules doctrine, as conceptualized by our dissenting colleague, is a heuristic for determining whether a given rule falls within an agen *388 cy’s congressionally delegated authority. Once the Supreme Court says that a rule does so — as Brand X did with regard to the FCC’s authority to treat ISPs as common carriers — our inquiry is over. Insofar as the FCC’s Order involves a major rule, then, Brand X resolves the agency’s statutory authority to adopt it.
II.
Our dissenting colleague separately argues that the First Amendment poses an independent bar to the FCC’s Order. The Order, he submits, infringes the First Amendment rights of broadband ISPs. Specifically, he understands Supreme Court precedent to recognize a First Amendment entitlement on the part of an ISP to block its subscribers from accessing certain internet content based on the ISP’s own preferences, even if the ISP has held itself out as offering its customers an indiscriminate pathway to internet content of their own — not the ISP’s — choosing.
Under that view, an ISP, for instance, could hold itself out to consumers as affording them neutral, indiscriminate access to all websites, but then, once they subscribe, materially degrade their ability to use Netflix for watching video — or even prevent their access to Netflix altogether — in an effort to steer customers to the ISP’s own competing video-streaming <service. Alternatively, an ISP, again having held itself out as affording its customers an unfiltered conduit to internet content, could block them from accessing (or significantly delay their ability to load) the Wall Street Journal’s, or the New York Times’s website because of a disagreement with the views expressed on one or the other site.
An ISP has no First Amendment right to engage in those kinds of practices. No Supreme Court decision suggests otherwise. Indeed, although the two dissenting FCC Commissioners objected to the agency’s adoption of the rule on multiple grounds, neither suggested the rule poses any First Amendment issue. Similarly, the principal parties challenging the Order in this court, who collectively represent virtually every broadband provider — including all of the major ISPs — bring no First Amendment challenge to the rule. The sole party to raise any claim under the First Amendment is Alamo Broadband Inc., which describes itself as “a small broadband provider” serving some 1,000 customers in Texas, and which is joined in its claim by an individual named Daniel Ber-ninger. Pet’rs’ Joint Proposed Briefing Format & Sched. 8; Alamo Br. 3.
Notwithstanding the arguments presented by Alamo and Berninger — and now also our dissenting colleague — the consensus view is correct: the net neutrality rule raises no issue under the First Amendment. The key to understanding why lies in perceiving when a broadband provider falls within the rule’s coverage. As the Order explains, broadband ISPs that are subject to the rule “sell retail customers the ability to go anywhere (lawful) on the Internet” — they “represente ] that they will transport and deliver traffic to and from all or substantially all Internet endpoints.” Order ¶ 27; see id. ¶¶ 15, 350. They “display no ... intent to convey a message in their provision” of internet access, id. ¶ 549, as would be necessary “to bring the First Amendment into play,” Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).
In particular, “[bjroadband providers” subject to the rule “represent that their services allow Internet end users to access all or substantially all content on the Internet, without alteration, blocking, or editorial intervention.” Id. ¶ 549 (emphasis added). Customers, “in turn, expect that they can obtain access to all content avail *389 able on the Internet, without the editorial intervention of their broadband provider.” Id. (emphasis added). Therefore, as the panel decision held and the agency has confirmed, the net neutrality rule applies only to “those broadband providers that hold themselves out as neutral, indiscriminate conduits” to any internet content of a subscriber’s own choosing. U.S. Telecom Ass’n, 825 F.3d at 743; see FCC Opp’n Pets. Reh’g 28-29.
For a broadband ISP that holds itself out to consumers as a “neutral, indiscriminate conduit” — i.e., as a pathway to “all content on the Internet, without alteration, blocking, or editorial intervention,” Order ¶ 549 — the rule requires the ISP to abide by its representation and honor its customers’ ensuing expectations. The ISP therefore cannot block its subscribers’ access to certain websites based on its own preferences. Nor can it engage in “throttling,” which, while stopping short of outright blocking, degrades a user’s experience with selected content so as to render it largely, even if not technically, “unusable.” Id. ¶ 17. Nor can an ISP create “fast lanes” favoring content providers who pay the ISP (or with whom it has a commercial affiliation), while relegating disfavored (i.e., nonpaying) providers to “slow lanes.” Id. ¶¶ 18, 126. Like blocking and throttling, paid prioritization practices of that variety are incompatible with a promise to provide a neutral, indiscriminate pathway to content of a customer’s own choosing.
The upshot of the FCC’s Order therefore is to “fulfill the reasonable expectations of a customer who signs up for a broadband service that promises access to all of the lawful Internet” without editorial intervention. Id. ¶¶ 17, 549. The FCC found that, once a consumer subscribes to a particular broadband service in reliance on such a promise, she faces high switching costs constraining her ability to shift away from her ISP if it reneges on its representation by blocking her access to select content. See id. ¶¶ 80-82, 97-99. The agency further explained that a subscriber might well have no awareness of her ISP’s practices of that kind in the first place: she may have no reason to suppose that her inability to access a particular application, or that the markedly slow speeds she confronts when attempting to use it, derives from her ISP’s choices rather than from some deficiency in the application. See id. ¶¶ 81, 99. After all, if a subscriber encounters frastratingly slow buffering of videos when attempting to use Netflix, why would she naturally suspect the fault lies with her ISP rather than with Netflix itself?
While the net neutrality rule applies to those ISPs that hold themselves out as neutral, indiscriminate conduits to internet content, the converse is also true: the rule does not apply to an ISP holding itself out as providing something other than a neutral, indiscriminate pathway — i.e., an ISP making sufficiently clear to potential customers that it provides a filtered service involving the ISP’s exercise of “editorial intervention.” Id. ¶ 549. For instance, Alamo Broadband, the lone broadband provider that raises a First Amendment challenge to the rule, posits the example of an ISP wishing to provide access solely to “family friendly websites.” Alamo Pet. Reh’g 5. Such an ISP, as long as it represents itself as engaging in editorial intervention of that kind, would fall outside the rule. See U.S. Telecom Ass’n, 825 F.3d at 743; FCC Opp’n Pets. Reh’g 28-29; FCC Br. 146 n.53. The Order thus specifies that an ISP remains “free to offer ‘edited’ services” without becoming subject to the rule’s requirements. Order ¶ 556.
That would be true of an ISP that offers subscribers a curated experience by blocking websites lying beyond a specified field of content (e.g., family friendly websites). *390 It- would also be true of an ISP that engages in other forms of editorial intervention, such as throttling of certain applications chosen by the ISP, or filtering of content into fast (and slow) lanes based on the ISP’s commercial interests. An ISP would need to make adequately clear its intention to provide “edited services” of that kind, id. ¶ 556, so as to avoid giving consumers a mistaken impression that they would enjoy indiscriminate “access to all content available on the Internet, without the editorial intervention of their broadband provider,” id. ¶ 549. It would not be enough under the Order, for instance, for “consumer permission” to be “buried in a service plan — the threats of consumer deception and confusion are simply too great.” Id. ¶ 19; see id. ¶ 129.
There is no need in this case to scrutinize the exact manner in which a broadband provider could render the FCC’s Order inapplicable by advertising to consumers that it offers an edited service rather than an unfiltered pathway. No party disputes that an ISP could do so if it wished, and no ISP has suggested an interest in doing so in this court. That may be for an understandable reason: a broadband provider representing that it will filter its customers’ access to web content based on its own priorities might have serious concerns about its ability to attract subscribers. Additionally, such a provider, by offering filtered rather than indiscriminate access, might fear relinquishing statutory protections against copyright liability afforded to ISPs that act strictly as conduits to internet content. See 17 U.S.C. § 512; Recording Indus. Ass’n of Am., Inc. v. Verizon Internet Servs., Inc., 351 F.3d 1229, 1233, 1237 (D.C. Cir. 2003).
In the event that an ISP nonetheless were to choose to hold itself out to consumers as offering them an edited service rather than indiscriminate internet access — despite the potential effect on its subscriber base — it could then bring itself outside the rule. In that sense, the rule could be characterized as “voluntary,” infra at 429-30 n.8 (Kavanaugh, J., dissenting), but in much the same way that just about any regulation could be considered voluntary, insofar as a regulated entity could always transform its business to such an extent that it is no longer in the line of business covered by the regulation.
Here, it would be no small matter for an ISP to decide to present itself to potential customers as providing a fundamentally different product — an edited service — than the neutral, indiscriminate access generally promised by ISPs and expected by consumers as standard service. No ISP has indicated in this court a desire to represent itself to consumers as affording them less of a “go wherever you’d like to go” service and more of a “go where we’d like you to go” service. Accordingly, Alamo Broadband, the only ISP to raise a First Amendment claim, makes no argument that it holds itself out as offering filtered access to web content, as opposed to offering an indiscriminate pathway to any content of its subscribers’ own choosing. Alamo nonetheless claims a First Amendment entitlement to filter its subscribers’ access to web content through blocking, throttling, and paid prioritization measures.
Alamo contends, for instance, that a broadband provider has a First Amendment right to provide faster access to its own video-streaming service than to a competing product. Alamo Reh’g Pet. 9. If so, an ISP could similarly afford fast-lane access (because paid to do so) to a particular service that sells tickets to concert events while degrading access to Ticketmaster, even though a customer might lose out on preferred seats while waiting for Ticketmaster to work. The same would be *391 true of measures favoring (or disfavoring) specific ride-sharing applications (e.g., Uber), travel websites (e.g., Expedia), or video-chat services (e.g., Skype), potentially causing customers, respectively, to wait longer for rides, to miss out on flight reservations at fares available for a limited period, or to fail to connect with family or friends for face-to-face interactions. Alternatively, the ISP could simply block access altogether rather than merely slow it down.
In all of those situations, an ISP would have held itself out as offering its customers unfiltered access to all internet content, but then would prevent them from accessing — or otherwise impair their ability to use — selected content it disfavors. The First Amendment does not give an ISP the right to present itself as affording a neutral, indiscriminate pathway but then conduct itself otherwise. The FCC’s Order requires ISPs to act in accordance with their customers’ legitimate expectations. Nothing in the First Amendment stands in the way of establishing such a requirement in the form of the net neutrality rule.
Contrary to our dissenting colleague’s argument, the Supreme Court’s Turner Broadcasting decisions do not grant ISPs a First Amendment shield against the net neutrality rule’s obligations. See infra at 427-28 (Kavanaugh, J., dissenting). Those decisions arose in a markedly different context. They addressed the validity under the First Amendment of statutory “must-carry” requirements calling for cable television operators to “devote a portion of their channels to the transmission of local broadcast television stations.” Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 626, 630, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); see Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997).
The Supreme Court ultimately upheld the must-carry obligations. In the process of doing so, however, the Court recognized that a cable operator’s choices about which programming to carry on its channels implicate the First Amendment’s protections. That is because a cable operator engages in protected First Amendment activity when it “exercis[es] editorial discretion over which stations or programs to include in its repertoire.” Turner Broad., 512 U.S. at 636, 114 S.Ct. 2445 (internal quotation marks omitted).
The same cannot be said of broadband providers subject to the FCC’s Order. Whereas a cable operator draws the protections of the First Amendment when it exercises editorial discretion about which programming to carry, an ISP falling within the net neutrality rule represents that it gives subscribers indiscriminate access to internet content without any editorial intervention. Cable operators, that is, engage in editorial discretion; ISPs subject to the net neutrality rule represent that they do not. The very practice bringing cable operators within the fold of the First Amendment’s protections is inapplicable in the case of broadband providers subject to the net neutrality rule.
For that reason, our dissenting colleague gains little by emphasizing that the same cable operators recognized to have First Amendment interests at stake in Turner Broadcasting also serve as broadband ISPs. See infra at 428 (Kavanaugh, J., dissenting). Our colleague thinks it entirely illogical to conclude that those entities receive First Amendment protection when transmitting television programming under must-carry obligations but not when transmitting internet content under the net neutrality rule. The distinction becomes entirely understandable, however, upon recognizing that cable operators exercise editorial discretion in the former *392 situation but disclaim any exercise of editorial intervention in the latter.
Indeed, the cable operators themselves evidently appreciate a distinction. In Turner Broadcasting, the party standing in the shoes of cable operators, presenting oral argument and briefing on their behalf, was NCTA (which then stood for National Cable Television Association). See 520 U.S. at 184, 117 S.Ct. 1174; 512 U.S. at 625, 114 S.Ct. 2445. Here, NCTA again represents cable operators, this time in their capacity as broadband providers. See, e.g., U.S. Telecom Ass’n, 825 F.3d at 687. In Turner Broadcasting, NCTA persuaded the Court that cable operators engage in protected First Amendment activity when selecting the television programming to include in their channel lineups. Yet here, the very same party — tellingly—raises no First Amendment challenge at all. It says quite a lot when the party that presumably understands better than anyone the import of the Turner Broadcasting decisions for cable operators apparently perceives no viable First Amendment objection to the net neutrality rule under those decisions. (That NCTA may have raised First Amendment concerns about previous net neutrality obligations, see infra 431 n.9 (Kavanaugh, J., dissenting), only magnifies its decision to forgo any such objection to the current rule.)
Our dissenting colleague presents a number of associated arguments emanating from his belief that Turner Broadcasting vests broadband providers with First Amendment protections when they block and throttle internet content. Those arguments, however, tend to fall away once one understands — as cable operators themselves evidently do — the inapplicability of Turner Broadcasting to this case.
As an example, our colleague rejects what he perceives to be the FCC’s “use it or lose it” conception of First Amendment rights. See infra at 428 (Kavanaugh, J., dissenting). But the chief reason the net neutrality rule raises no First Amendment problem is not that ISPs have lost their First Amendment rights by refraining from actively filtering the internet content they transmit to subscribers. The lack of a viable First Amendment claim stems from what ISPs have (or have not) said, not from what they have (or have not) done. When a broadband provider holds itself out as giving customers neutral, indiscriminate access to web content of their own choosing, the First Amendment poses no obstacle to holding the provider to its representation. That amounts to an “if you say it, do it” theory, not a “use it or lose it” theory.
Our dissenting colleague likewise errs in fearing a slippery slope under which the government could require widely used web platforms such as Facebook, Google, Twitter, and YouTube, or a widely used commercial marketplace such as Amazon, to accept or promote all relevant content on nondiscriminatory terms. See infra at 429, 433 (Kavanaugh, J., dissenting). Those companies evidently do not share our colleague’s concern — all but one is a member of a group that supports the rule in this court. See Internet Association Amicus Br. in Support of Resp’ts iv. That may be in part because those companies, in contrast with broadband ISPs, are not considered common carriers that hold themselves out as affording neutral, indiscriminate access to their platform without any editorial filtering. If an agency sought to impose such a characterization on them, they would presumably disagree. Here, by contrast, the rule applies only to ISPs that represent themselves as neutral, indiscriminate conduits to internet content, and no ISP subject to the rule — including Alamo Broadband — has disclaimed that characterization in this court.
*393 The real slippery-slope concerns run in the reverse direction. Under our dissenting colleague’s approach, broadband ISPs would have a First Amendment entitlement to block and throttle content based on their own commercial preferences even if they had led customers to anticipate neutral and indiscriminate access to all internet content. There is no apparent reason the same conclusion would not also obtain in the case of telephone service, which, like broadband service, is classified as common carriage.
Imagine if a telephone provider held itself out as an indiscriminate conduit for phone communications but wished to block or impair access to select endpoints based on the provider’s own editorial preferences. A telephone company might, for example, restrict access to certain numbers based on political affiliation or other criteria. The company would have an entitlement to do so under our colleague’s understanding of the First Amendment.
Our colleague suggests that telephone companies differ from broadband providers in that they generally do not carry “mass communications.” Infra at 434 n.13 (Kavanaugh, J., dissenting). But speech directed to a finite audience is no less protected than speech available on a broader scale. And the category of “mass communications,” in any event, is hardly self-defining. One can readily envision circumstances in which telephone service would fairly be considered to involve mass communication (text messages or recorded voice messages designed to reach a broad audience, for instance). Our colleague’s understanding of broadband providers’ First Amendment rights would arm telephone companies with parallel rights to block or filter phone service, contradicting a long history of uncontroversial regulation of that service.
For all of those reasons, broadband ISPs have no First Amendment entitlement to hold themselves out as indiscriminate conduits but then to act as something different. The net neutrality rule assures that broadband ISPs live up to their promise to consumers of affording them neutral access to internet content of their own choosing. The rule, in doing so, does not infringe the First Amendment.